UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **FRANCA CAOUETTE,**<br><br>Plaintiff,<br><br>v.<br><br>**CENLAR FSB,**<br><br>Defendant. | **JURY TRIAL DEMANDED**<br><br>CASE NO. 22-80<br><br><br>January 14, 2022 |

## COMPLAINT

Plaintiff Franca Caouette, by and through counsel, hereby brings this action against Cenlar FSB ("Cenlar"), and states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and an amount in controversy greater than $75,000.

2. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

### PARTIES

3. The Plaintiff Franca Caouette is a natural person residing in Wolcott, Connecticut.

4. The Plaintiff is a "person" within the meaning of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq. ("CUTPA") in that she is a "natural person" under Conn. Gen. Stat. § 42-110a(3).

5. The Defendant Cenlar is a federally-chartered savings association, engaged in the business of servicing residential mortgage loans in Connecticut, with its headquarters located at 425 Phillips Boulevard, Ewing, New Jersey 08618.

## SUMMARY OF CLAIMS

6. Ms. Caouette asserts a statutory claim for violation of CUTPA against Cenlar based on the years of mistakes it has already admitted making while servicing Ms. Caouette's mortgage including, without limitation, its willful and repeated refusal to fix those mistakes until more than two years had passed and its continuing failure to perform the basic function of mortgage servicing.

## FACTUAL ALLEGATIONS

7. Ms. Caouette lives at 31 Oak Street, Wolcott, CT 06716.

8. On February 7, 2019, Cenlar executed a loan modification agreement that it had drafted and that Ms. Caouette had already executed. A true and correct copy of the modification agreement is attached hereto as Exhibit A. Under the terms of the modification agreement, Ms. Caouette agreed to make monthly payments of $366.51 on the principal and interest on the loan plus approximately $450, as required, to cover property taxes and property insurance in her escrow account.

9. From its effective date in November 2018 through November 2020, Ms. Caouette made timely payments in accordance with the loan modification agreement. Ms. Caouette ceased making payments in December of 2020 only because Cenlar refused to accept further payments and forced her into a forbearance plan at the threat of false credit reporting. As soon as Cenlar

permitted Ms. Caouette to make payments again in September of 2021, she resumed making payments and also paid Cenlar what she owed for the time she was in forbearance.

10. Despite Ms. Caouette's timely payments, Cenlar repeatedly misapplied Ms. Caouette's payments from November 1, 2018 through November 1, 2020. Cenlar then declared—without any justification—that Ms. Caouette was not making payments and had fallen significantly behind on her mortgage.

11. In phone calls and letters, Cenlar repeatedly threatened Ms. Caouette with the ramifications of this purported delinquency it had manufactured. Cenlar told Ms. Caouette that she was obligated to pay thousands of dollars more than she owed. For example, Cenlar's July 2020 mortgage statement for Ms. Caouette's account stated that she was behind on her mortgage by $22,085.82. That same statement indicated that she had nevertheless made $15,197.58 in payments, which Cenlar had refused to apply to her account. By January of 2021, the amount Cenlar claimed Ms. Caouette was behind by had risen to $26,980.93, while at the same time it held payments of hers totalling $20,072.68 that it refused to apply to her account.

12. Ms. Caouette spent countless hours on the phone with Cenlar to explain that she had made all the payments required under the modification agreement and attempt to understand why they believed she was in default. Cenlar ignored Ms. Caouette's repeated pleas that it adhere to the modification agreement it had proposed, drafted, and signed.

13. Cenlar routinely lost documents that were crucial to Ms. Caouette's account, which made it significantly more challenging for Ms. Caouette to resolve the issues Cenlar had created. On more than a dozen occasions, Ms. Caouette paid to mail Cenlar documents that Cenlar should have already had access to. The documents that she sent to Cenlar included the modification agreement.

14. Additionally, Cenlar has continued to send documents related to Ms. Caouette's mortgage to Joseph Caouette, Ms. Caouette's ex-husband. Mr. Caouette quit-claimed the property to Ms. Caouette and no longer has any ownership interest in the home. Still, Mr. Caouette received private information about the status of Ms. Caouette's account, including letters erroneously stating that Ms. Caouette was behind on her payments by thousands of dollars. As a result, Ms. Caouette has had many distressing phone conversations with her ex-husband in which he has accused her of being financially irresponsible.

15. Ms. Caouette has repeatedly paid to mail documentation to Cenlar that shows that Mr. Caouette quit-claimed the home to her and has asked multiple Cenlar representatives to update her account so that Mr. Caouette no longer receives private information about the payments she has made. Cenlar has refused to resolve the issue.

16. Cenlar would only accept Ms. Caouette's payments over the phone. These phone calls frequently lasted more than an hour because of Cenlar's grossly inadequate customer service system. When Ms. Caouette requested that Cenlar allow her to make payments online, Cenlar told her that she could not use their online portal because they believed she was in default. Nothing in any documents signed by Ms. Caouette contained a requirement that she pay over the phone, but Cenlar imposed it unilaterally as part of its continuous inability to do its most basic job as a mortgage servicer: collect the payments that were owed and properly credit them to the account.

17. On or around December 10, 2020, Ms. Caouette attempted to make her monthly payment, but Cenlar would not accept the payment. Cenlar insisted that Ms. Caouette owed more than $26,000 on her mortgage, and refused to accept payments until she paid that amount. Cenlar also

told Ms. Caouette that the modification agreement signed on February 7, 2019 had inexplicably "expired."

18. By this time, Ms. Caouette had reminded Cenlar about the modification agreement numerous times. Still, Cenlar willfully ignored Ms. Caouette and its obligation to recognize Ms. Caouette's modification.

19. In December 2020 and January 2021, Ms. Caouette spent many hours attempting to understand why Cenlar believed she owed them more than $26,000 and was claiming her modification had "expired." Even after Ms. Caouette had multiple lengthy telephone conversations with a number of Cenlar's customer service representatives, Cenlar could not explain why it believed she was in default and did not resolve these issues.

20. When Ms. Caouette called for an explanation, Cenlar would usually match her with a new Cenlar representative, to whom she would have to repeatedly explain her story. Cenlar's representatives would frequently transfer Ms. Caouette to different Cenlar representatives across several Cenlar departments. Ms. Caouette regularly spent more than an hour on hold waiting to speak to Cenlar representatives.

21. Cenlar's representatives also called Ms. Caouette during her workday on many occasions to insist that she owed Cenlar tens of thousands of dollars more than she actually owed. On at least one occasion, a Cenlar representative called Ms. Caouette but was unable to explain why he called. The call lasted more than an hour.

22. In January 2021, Cenlar suggested that Ms. Caouette should enter into a Cenlar-designed forbearance plan for her mortgage. Ms. Caouette indicated that she would like to continue making monthly payments, in accordance with the terms of the mortgage modification agreement, but Cenlar would not accept these payments unless Ms. Caouette first cleared her

purported $26,000 balance. Cenlar, again, wrongly claimed Ms. Caouette that she was in default and threatened to damage her credit by making that claim of default to the credit bureaus if she did not quickly accept Cenlar's "offer" of a forbearance plan. Ms. Caouette agreed to go into forbearance to prevent Cenlar from unfairly damaging her credit score.

23. On January 25, 2021, Cenlar set up a forbearance agreement for the period of January 1, 2021 through June 30, 2021. On June 16, 2021, Ms. Caouette reluctantly agreed to extend the forbearance plan until December 31, 2021, despite her preference to make payments, because Cenlar was still unable to resolve its internal confusion about her account.

24. Because Cenlar did not credit Ms. Caouette's timely and accurate payments to her account, there was a glaring absence of payments toward the mortgage within Ms. Caouette's payment history.

25. This lack of payment history and the delinquency Cenlar manufactured prevented Ms. Caouette from refinancing her mortgage and reducing her interest rate in the process. Ms. Caouette worked on refinancing her mortgage through Cenlar and a second mortgage through Bank of America for more than eight months starting in September of 2020. Her mortgage broker, New England Residential Finance, told her it could help her obtain a new mortgage that would pay off her two existing mortgages and lower her overall interest rate to 2.625%. The sole reason she was unable to refinance was that Cenlar failed to provide New England Residential Finance with a payment history that reflected the payments that Ms. Caouette had made consistently for the previous two years. As a result, Ms. Caouette must make larger payments on the interest on her two mortgages every month. The current interest rates on her mortgages are 4.75% for her primary mortgage (with Cenlar) and 6.5% for her second mortgage.

26. Additionally, Ms. Caouette paid to have her home appraised two times in order to refinance. Cenlar's actions prevented Ms. Caouette from refinancing, so Ms. Caouette was unable to use these appraisals to help secure her refinancing.

27. Ms. Caouette spent countless hours on the phone with Cenlar attempting to get accurate payment information so that she could refinance. In addition, New England Residential Finance's Managing Director Michael Rousseau and his assistant reached out directly to Cenlar on numerous occasions to attempt to get this information from them. Cenlar's customer service representatives were nonresponsive to these inquiries and instead kept to scripted replies that did not address Cenlar's ongoing misconduct.

28. When Ms. Caouette requested her payment history from Cenlar, Cenlar was extremely slow to provide that information and the payment history was littered with transactions that Ms. Caouette had not initiated. For example, the payment history that Cenlar sent Ms. Caouette on February 12, 2021 included nineteen transactions on January 25, 2021 that reduced Ms. Caouette's escrow balance from $10,210.82 to $2,378.26 and her principal balance from $75,560.23 to $74,305.03.

29. The information that Cenlar did provide Ms. Caouette over the phone and in letters was incorrect and often contradicted other information that Cenlar had provided. For example, on a payoff statement dated October 29, 2020, Cenlar stated that the total due under the mortgage was $96,558.64. However, in a payoff statement dated January 26, 2021, the total due had dropped to $79,925.90. Cenlar provided no explanation for why Ms. Caouette's total due on the two payoff statements differed by almost $17,000, when Ms. Caouette had only made regular payments during the intervening three months.

30. On February 26, 2021, Michael Rousseau was finally able to get a Cenlar representative on the phone who claimed to understand the issues Ms. Caouette was having and promised to help get her an accurate payment history. The Cenlar representative asked Ms. Caouette to provide bank statements demonstrating that the payments to Cenlar were being debited from her account.

31. Ms. Caouette provided the bank statements, but Cenlar still did not resolve the issue. Instead, the payment history that New England Residential Finance received from Cenlar in March still did not show Ms. Caouette had regularly made her mortgage payments.

32. In or around February 2021, Ms. Caouette sought legal advice from Sarah Poriss as a result of Cenlar's refusal to accept Ms. Caouette's payments. Ms. Caouette paid $350 for Ms. Poriss's legal services.

33. On April 19, 2021, Ms. Caouette sent a certified letter to Cenlar. The letter requested Ms. Caouette's payment history, pointed out that Cenlar had failed to comply with the terms of the modification agreement, and asked Cenlar to explain significant discrepancies in the payoff history and loan statements it had sent to Ms. Caouette in the past. The letter also included a copy of the executed modification agreement. Ms. Caouette called regularly to ask for updates on Cenlar's investigation into the issues she had raised in this letter. Cenlar's representatives told Ms. Caouette that she should continue calling each week for updates. Even after Ms. Caouette followed up many times over nearly four months, Cenlar never responded to the letter or provided the requested information.

34. On August 2, 2021, Ms. Caouette filed a complaint with the Office of the Comptroller of the Currency regarding Cenlar's failure to recognize her modification agreement and allow her to make payments.

35. On August 30, 2021, Cenlar sent Ms. Caouette a letter in which it finally admitted that it had breached the modification agreement. The letter stated that Cenlar had "failed to execute the final modification documents" and that it further had erred in incorrectly applying Ms. Caouette's payments "as credits instead of payments" for a two-year period. It attributed both issues to "an error in [its] closing department." A true and correct copy of the letter is attached hereto as Exhibit B. Cenlar made a series of more than a hundred transactions that brought Ms. Caouette's account current through December 1, 2020, the last date when Ms. Caouette made a payment before she was forced to go into forbearance to avoid damaging her credit rating.

36. Due to Cenlar's conduct, Ms. Caouette has been forced to divert precious hours from her occupation to repeated conversations with Cenlar representatives who provided little to no assistance. Her work was frequently interrupted by Cenlar representatives who called with incorrect and alarming information.

37. As a result of Cenlar's inability and refusal to resolve the issues with her account or accurately answer basic questions about what she owed, Ms. Caouette experienced extreme anxiety about her financial situation. She lived in constant fear that she would lose her home despite making payments on time under the modification agreement. Cenlar's representatives told her she was at risk of foreclosure and might need to sell her home. None of the steps she took to get Cenlar to acknowledge its mistakes seemed to make a difference. She felt she could not take it anymore. Ms. Cenlar spent significant time with her therapist discussing the emotional toll of an unexplained and substantial balance on her home mortgages.

38. Ms. Caouette has gone above and beyond what should be expected of any ordinary consumer in order to attempt to resolve the issues that Cenlar manufactured. She has asked Cenlar to accept her payments and recognize the modification agreement countless times since

February 2019. She has paid to mail documents to Cenlar, only to later learn that Cenlar had lost the documents that she sent them. Cenlar has not remedied the myriad of financial and emotional harms it has caused to Ms. Caouette during this time, and it has never offered to compensate Ms. Caouette for the harm it caused her.

## CAUSES OF ACTION

### Count I - *Unfair Acts and Practices Under CUTPA*

39. Ms. Caouette restates and incorporates all of her statements and allegations contained in paragraphs 1 through 38 in their entirety, as if fully rewritten herein.

40. Cenlar's actions were done in the conduct of trade or commerce.

41. Cenlar is a "person" within the meaning of Conn. Gen. Stat. § 42-110b(a), as defined in § 42-110a(3).

42. Cenlar has engaged in unfair acts or practices within the meaning of Conn. Gen. Stat. § 42-110b(a) including, but not limited to:

   a. Refusing to recognize the loan modification agreement it had signed, misallocating Ms. Caouette's payments and requiring her to certify mail her executed modification agreement multiple times over the course of the near two years that she had been under the terms of the agreement and faithfully making payments;

   b. Forcing Ms. Caouette to incur unnecessary charges in order to substantiate the legitimacy of her modification agreement– even after she notified them over the phone that they have repeatedly failed to recognize the agreement;

c. Misallocating and improperly crediting her regular, on-time payments to her account;

d. Refusing to accept several of Ms. Caouette's properly tendered mortgage payments as a result of its sloppy work in allocating her payments and its failure to recognize her modification agreement;

e. Despite Cenlar's errors in crediting her on-time payments, requiring that Ms. Caouette pay an inflated, incorrect $26,000 balance in order for Cenlar to accept any future payments, thereby forcing her into a forbearance arrangement because of its incompetence;

f. Threatening Ms. Caouette with foreclosure;

g. Communicating with Ms. Caouette through customer service representatives who were uninformed about her situation, and gave her conflicting, incorrect, and incomplete information, while not taking the necessary actions to correct their mistakes;

h. Failing to provide accessible customer service personnel, which forced Ms. Caouette to spend countless hours waiting to speak to customer service representatives, who then would often transfer Ms. Caouette to across several Cenlar departments, which only prolonged the process of getting crucial information from Cenlar;

i. Continuing to list Ms. Caouette's ex-husband on mortgage documents, even wrongly calling him to notify him the mortgage was in default, despite Ms. Caouette repeatedly notifying Cenlar that they had been divorced and that her ex-husband should no longer be listed as a party to the mortgage and despite Ms.

        Caouette paying to mail documentation proving this to Cenlar on numerous occasions;

    j. Causing Ms. Caouette's ex-husband to harass her, insult her, and accuse her of being financially irresponsible.

43. Cenlar's conduct has offended public policy, including the servicing rules found in Connecticut state law, *see* Conn. Gen. Stat. § 36a-498e(a)(2), and in federal Regulation X issued by the CFPB, *see* 12 C.F.R. § 1024.40.

44. Cenlar failed to properly respond to errors identified by Ms. Caouette, and in doing so failed to "maintain policies and procedures that are reasonably designed to . . . [i]nvestigate, respond to, and, as appropriate, make corrections in response to complaints asserted by a borrower . . . ." 12 C.F.R. § 1024.38(b)(1)(ii).

45. Cenlar's egregious bungling of Ms. Caouette's account could have been rectified sooner had it decided to communicate with Ms. Caouette through representatives that were knowledgeable about her situation. Each time Ms. Caouette spoke with a customer service representative from Cenlar; she was transferred across departments, and each time she needed to explain her situation anew. Each representative told her something different about her situation, giving her conflicting information about how much she owed, what the errors were, and how she – rather than Cenlar, the culprit – could rectify them. Cenlar's ill-informed representatives demonstrate a failure to "maintain policies and procedures reasonably designed to ensure that servicer personnel assigned to a delinquent borrower . . . [p]rovide the borrower with accurate information . . . ." 12 C.F.R. § 1024.40(b)(1).

46. Cenlar's actions were oppressive. Cenlar chose to avoid expending adequate resources to properly investigate and resolve the issues Ms. Caouette raised, despite having access to vast

resources as a federally-chartered, wholesale bank, servicing more than 3 million mortgage loans from more than 150 banks, credit unions and mortgage bankers. Instead of listening to her, Cenlar ignored her and drove her toward a forbearance arrangement she did not want with threats of trashing her credit to the credit reporting bureau, frustrating her efforts to refinance on her home, and overwhelming her with anxiety and fear of losing her home. Cenlar's actions only served to enrich Cenlar, by keeping its own expenses down and retaining the fees it charged, at the expense of Ms. Caouette's well being and sense of security.

47. Cenlar's actions were immoral, unethical, and unscrupulous. Cenlar retained and cashed all of Ms. Caouette's on-time payments without crediting those payments to her account, in spite of repeated attempts by Ms. Caouette to remedy Cenlar's mistakes with her modification agreement. When Ms. Caouette notified Cenlar of their errors in writing, it carelessly assembled a response without resolving the underlying errors in her account, falsely assuring her that the errors were resolved only to demand that she pay another inflated and incorrect balance weeks later. Cenlar enriched itself as a result of these ongoing errors, and has taken no steps to permanently remedy their long-term errors with Ms. Caouette's account.

48. Cenlar's carelessness and blatant disregard for Ms. Cauoette's well-being caused substantial injury to Ms. Caouette that she could not reasonably avoid, given that she was willing to make every mortgage payment due on her account and would have done so but for Cenlar's series of errors.

49. As a result of Cenlar's misconduct, Ms. Caouette has suffered severe anxiety and emotional distress, which has only been exacerbated by their sloppiness in reaching out to her ex-husband in seeking to collect on debts that Ms. Caouette does not owe to Cenlar. She has also been unable to refinance her home to take advantage of lower market interest rates, as Cenlar's

failure to recognize her modification agreement and correctly allocate her payments has obscured what should otherwise be an exceptional payment history. This has cost Ms. Caouette thousands of dollars in accrued interest.

50. Cenlar's actions expose a culture of understaffing, poor training, lackluster customer service, and disorganized file maintenance and systems management. This culture displays a disregard for the wellbeing of Cenlar's customers, including Ms. Caouette.

51. Providing inadequate customer service in the mortgage servicing context causes severe distress, and adversely affects the ability of Ms. Cauoette and consumers like her to work.

52. This injury is not outweighed by any countervailing benefits to Ms. Caouette or consumers like her.

53. As a result of the foregoing acts, Ms. Cauoette has suffered an ascertainable loss, as that term is used in Conn. Gen. Stat. § 42-110g(a), including, without limitation, loss of the fees she paid to Sarah Poriss for legal advice in her dealings with Cenlar, the postage fees she paid when she repeatedly sent her modification documents and other important documents to Cenlar, the thousands of dollars in interest that she will pay because she was unable to refinance when it would have been advantageous for her to do so, and the amounts she paid to have her home appraised while working towards a refinance agreement that Cenlar made impossible.

54. Ms. Caouette has also suffered accompanying anxiety from fear of potentially losing her home, and confusion and mental distress from Cenlar's refusal to communicate with her through competent customer service representatives. Cenlar's oppressive tactics have also inhibited Ms. Caouette's ability to excel in her sales-driven job, as the hours of time Ms. Caouette has spent on the phone with Cenlar's uninformed and ill-prepared representatives directly took time away from her ability to make sales during work hours.

55. This misconduct has also interfered with her ability to emotionally move on from her divorce, as Cenlar's refusal to acknowledge her divorce decree and collections practices have contributed to continued negative interactions with her ex-husband.

56. As a result of its violation of CUTPA, Cenlar is liable to Ms. Caouette for actual and consequential damages, costs, and attorney's fees pursuant to Conn. Gen. Stat. § 42-110g(d).

## Count II - *Recklessly Unfair Acts or Practices Under CUTPA*

57. Ms. Caouette restates and incorporates all of her statements and allegations contained in paragraphs 1 through 56 in their entirety, as if fully rewritten herein.

58. Cenlar's conduct alleged above continued over the span of nearly three years and persisted in spite of Ms. Caouette's fervent efforts to ensure that Cenlar recognized her modification agreement, her divorce, and her payments.

59. This thoughtless conduct was without reasonable justification or excuse, and persisted after Ms. Caouette notified it of its errors. In refusing to remedy the situation, Cenlar was aware of its shortcomings and yet continued to demonstrate a reckless indifference to Ms. Caouette's rights.

60. Accordingly, Ms. Caouette is entitled to punitive damages under Conn. Gen. Stat. § 42-110g(a).

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff Franca Caouette respectfully requests that this Court enter an order granting Judgment against Defendant Cenlar for the following:

A. Actual damages against Defendant as to all allegations contained in Counts I and II;

B. Punitive damages, pursuant to Conn. Gen. Stat. § 42-110g(a), as to all allegations contained in Count II; and

C. Reasonable attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g(d), as to Counts I and II.

THE PLAINTIFF<br>
FRANCA CAOUETTE

| Law Student Interns: | By _____/*Jeffrey Gentes*/_____ |
|---|---|
| | Jeffrey Gentes (Bar No. ct28561) |
| Sarah Baldinger | J.L. Pottenger, Jr. (Bar No. ct05479) |
| Yale Law School '22 | Jerome N. Frank Legal Services Organization |
| | P.O. Box 209090 |
| Nicole Cabanez | New Haven, CT 06520-9090 |
| Yale Law School '22 | Tel: (203) 432-4800 |
| | Fax: (203) 432-1426 |
| Miriam Pierson | jeffrey.gentes@ylsclinics.org |
| Yale Law School '23 | j.pottenger@ylsclinics.org |
| | |
| Perry Kumagai | |
| Yale Law School '22 | |